Filed 1/2/24  In re Russell E. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re RUSSELL E., a Person Coming Under the Juvenile Court Law. | B327145 (Los Angeles County Super. Ct. No. 22CCJP04085A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>NAOMI P.,<br><br>        Defendant and Appellant. | |

        APPEAL from orders of the Superior Court of Los Angeles County.  Nancy Ramirez, Judge.  Affirmed and remanded with directions.

Gina Zaragoza, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Kelly G. Emling, Deputy County Counsel, for Plaintiff and Respondent.

_____

Naomi P. (mother) appeals from the juvenile court's order terminating jurisdiction over her son, Russell E. (Russell, born Oct. 2013), pursuant to section 361.2 of the Welfare and Institutions Code.[1]  She also challenges the exit order, which gives sole legal and physical custody to Robert E. (father) with twice monthly monitored visitation for mother.

We agree that the matter must be remanded so that the juvenile court can set forth, in the exit order, its reasons for removing Russell from mother's custody and limiting her visitation rights.  In all other respects, the orders are affirmed.

**FACTUAL AND PROCEDURAL BACKGROUND**

**I.      The Family**

Mother and father share one child, Russell.  The pair separated when Russell was three or four years old.  In November 2018, the family court issued an order granting the parents joint legal and physical custody.  The order established a 2-2-5 custody schedule.[2]

---

[1]      All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

[2]      A 2-2-5 custody schedule gives each parent custody for two fixed weekdays and alternating weekends.

2

In February 2022, the family court found "a significant change in circumstances based on the parties['] continued failure and inability to . . . select a mental health therapist[]" for Russell. Accordingly, the court awarded father "tie breaking authority over all medical decisions[,]" and ordered him to "select a therapist" to provide "therapy twice per month" to Russell.[3]

## II.    Referral and Investigation

On October 11, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received an anonymous telephone referral alleging that mother physically abused Russell.  The caller said that mother had requested that Russell be placed on a psychiatric hold pursuant to section 5585, claiming that he had run into a busy street.  Conversely, Russell told the caller that mother "was hitting him and punched him in the mouth[,]" prompting him to leave the house.

An emergency room social worker later reported that, although the attending doctor did not "feel there was a reason" to put a hold on Russell, the facility decided to place the hold "since [Russell] was stating he did not want to return home with . . . mother and . . . mother was refusing to take [Russell] home[.]" Mother refused to provide the facility with father's contact information, and accused father of hitting Russell.

### A.    *Interview with Russell*

When a social worker located Russell at a behavioral health facility, Russell told her that mother had punched him in the face, cutting his upper lip.  He then left mother's house and safely

---

[3]    DCFS obtained copies of both family law orders and submitted them to the juvenile court.  Although the juvenile court ordered DCFS to obtain the family law case file, DCFS reported that it could not find further records.

3

walked to a nearby market so that he could try to use their phone to call father. When mother found Russell, she took him to the emergency room.

Russell claimed that mother had physically abused him since he was six years old. In the past, she had kicked him, choked him, and "flick[ed] [him] on [his] mouth and ears." The abuse often left him with marks and bruises. He also showed the social worker a bruise on his arm, which he attributed to mother grabbing him and dragging him down a hallway.

Russell also said that mother did not consistently feed him; on one occasion he rationed the only food he was given, a single bagel, thinking it might have to last him for two days. Mother also denied him prescribed medication for his diagnosed attention deficit hyperactive disorder (ADHD), which she "d[id]n't believe he ha[d]."

### B.     *Interview with Father*

Father spoke to the social worker shortly after arriving at the hospital. He said that when Russell stayed with mother, father went to Russell's school in the morning to bring him fresh clothes, food, and medication, since mother often failed to provide these necessities.

At the social worker's request, father sent DCFS a three-and-a-half-page list that Russell had written during a therapy session "of all the things that mother had done that ma[d]e him scared or sad." The list included items such as "[t]hreatening to punch" and "kill me"; "[k]icking" and "[p]ushing me" and "[t]hrowing me on the ground[;]" "giv[ing] me marks and bruises and doesn't care about it[;]" "[w]ants me and my dad to be dead (especially me)[,]" and "[m]akes me feel dizzy and lightheaded because she doesn't give me food and water[.]"

4

### C. *Attempts to Interview Mother*

Mother left the hospital shortly after the social worker arrived. When the social worker reached mother by phone, she said that she was too busy to speak but volunteered to submit to an interview the following day. Mother called a DCFS hotline later that same day to complain about father's alleged misbehavior, but rebuffed the social worker's multiple attempts to interview her over the next two days.

## III. Removal and Jurisdiction Petition

On October 13, 2022, Russell was removed from mother's custody and released to father. The juvenile court ordered monitored visitation for mother.

Four days later, DCFS filed a dependency petition under section 300, subdivisions (a) (nonaccidental physical harm), (b)(1) (failure to protect) and (c) (emotional harm). Counts a-1 and b-1 alleged that mother "physically abused" Russell by, among other things, "str[iking] him with a closed fist on [his] mouth resulting in [him] sustaining injury to [his] upper lip" and "not feed[ing]" him. Count b-2 added that mother "failed to dispense . . . prescribed medication to" Russell. And count c-1 alleged that mother "emotionally abused" Russell by, among other things, "threatening to kill" him. This "physical abuse", "medical neglect", and "emotional abuse" "endanger[ed] [Russell's] physical and emotional health and safety and place[d] [him] at risk of serious physical and emotional harm."

## IV. Subsequent Reports

DCFS filed a last minute information notifying the juvenile court that mother had finally submitted to an interview on October 20, 2022. Mother "denied hitting [Russell] at all and denied knowledge of the injury." She accused Russell of "'lying about any incident'" and said that he had "'abus[ed]'" her "'just like his father.'" She also denied the allegations of food

deprivation, saying that Russell is "being controlled and manipulated by his father."

DCFS subsequently filed a jurisdiction report which stated that Russell had undergone a forensic examination and "provided clear and consistent statements regarding physical abuse, stating [mother] punched and flicked his mouth, resulting in a laceration on his lip." (Bolding omitted.) When a social worker interviewed Russell on November 9, 2022, he said "'I just don't want to go back to live with [mother], please let me stay with [father]. I feel safe with [father] and I get food and medication. I'm happy here[.]'"

The report noted that Father "has been cooperative with [DCFS]," "appears to have a strong bond with" Russell, and "took appropriate action to protect [Russell] once he became aware of the allegations." In father's custody, Russell saw a therapist weekly, and his behavioral issues at school improved.

Lastly, DCFS filed an addendum report in which it described a second interview with mother, who again denied all the allegations and accused Russell of lying. DCFS noted that mother was neither cooperative nor communicative with DCFS, and would not provide proof of enrollment in the services she claimed to be voluntarily attending.

DCFS ultimately "recommend[ed] that the [juvenile] [c]ourt terminate jurisdiction granting father sole physical and legal custody in order to ensure [Russell's] medical and mental needs are being met without any barriers[,]" with mother "to further have monitored visits[.]"

## V. Adjudication Hearing

On January 30, 2023, the juvenile court held a contested adjudication hearing. After hearing argument and accepting evidence from DCFS and mother, the juvenile court sustained all counts alleged in the jurisdiction petition, noting that it found

6

"Russell's statements" on the abuse he endured in mother's custody "to be very credible" and "consistent." Accordingly, the juvenile court declared Russell a dependent and removed him from mother's custody. The court then released Russell to father and terminated jurisdiction pending the issuance of a revised custody order.

The following day, the juvenile court issued an exit order granting father sole legal and physical custody. The order allowed mother to have "only supervised visitation" "[a]s arranged by the parents, but no less than . . . 3 hour(s), 2 times per . . . month[.]" The order did not give a reason for restricting mother's custody and visitation rights.

## VI. Appeal

Mother timely appealed.

## DISCUSSION

## I. Termination of Jurisdiction

### A. *Relevant Law and Standard of Review*

Section 361.2, subdivision (b)(1), states that if the juvenile court places a child with a parent with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of section 300, the court can terminate jurisdiction over the child. (§ 361.2, subd. (b)(l).) In considering that option, the juvenile court's primary focus is the best interests of the child. (*In re John W.* (1996) 41 Cal.App.4th 961, 965.)

We review the order terminating jurisdiction either for an abuse of discretion (*In re Holly H.* (2002) 104 Cal.App.4th 1324, 1327) or for substantial evidence (*In re Aurora P.* (2015) 241 Cal.App.4th 1142, 1156). Accordingly, we will not disturb the juvenile court's decision unless ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citation]."" (*In re Stephanie M.*

7

(1994) 7 Cal.4th 295, 318.) Where substantial evidence supports the trial court's order, there is no abuse of discretion. (*In re Daniel C.H.* (1990) 220 Cal.App.3d 814, 839.)

**B.** *Analysis*

After the juvenile court placed Russell with father, a nonoffending parent, it was fully authorized to terminate jurisdiction if termination would be in Russell's best interest. Here, the record provided numerous indications that Russell was happy and thriving under father's care, and there were no outstanding safety concerns requiring the juvenile court's ongoing supervision of that placement. Therefore, the juvenile court did not abuse its discretion in terminating jurisdiction.

Mother raises three arguments against our conclusion, all of which are unavailing. First, she argues that the juvenile court "lack[ed] vital information as to [Russell]'s best interest prior to terminating jurisdiction[]" because it failed to obtain and review the entire case file from the prior family law case. As mother concedes, she waived this argument by failing to make any objections regarding the case file before the juvenile court.[4] (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 345 ["[T]he failure to object to a disposition order on a specific ground generally forfeits a parent's right to pursue that issue on appeal"].)

Mother's argument also fails on the merits. Assuming arguendo that the juvenile court erred by terminating jurisdiction without first reviewing the complete case file, mother has not demonstrated how she was prejudiced by that error; she neither describes the allegedly "vital information" contained in the case file, nor explains what effect it could have had on the juvenile

---

[4] Mother urges us to exercise our "discretion to consider forfeited claims[,]" but does not offer any reason for us to do so.

8

court's ruling.[5] (See *In re R.F.* (2021) 71 Cal.App.5th 459, 474 ["[T]he 'harmless error' test [citation] applies in dependency matters, and therefore a judgment in a dependency case should not be set aside unless it is reasonably probable the result would have been more favorable to the appealing party but for the error"]; *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1322–1323 ["The burden is on the appellant in every case affirmatively to show error and to show further that the error is prejudicial . . . ."].)

Second, mother contends that terminating jurisdiction was not in Russell's best interest, because mother had been his custodial parent since birth, the two shared a loving relationship, and termination of jurisdiction deprived Russell of the opportunity to receive services for his ongoing behavioral issues. Mother ignores that, by the time of the adjudication hearing, her relationship with Russell had been substantially damaged by years of abuse; by removing Russell from her care, the juvenile court expressly found that this abuse was detrimental to him. (Cf. *In re Liam L.* (2015) 240 Cal.App.4th 1068, 1085 ["'What is in the best interests of the child is essentially the same as that which is not detrimental to the child.' [Citation.]"].) Moreover, Russell was already receiving therapeutic services and showing behavioral improvement while in father's custody.

Third, mother contends that the juvenile court's termination of jurisdiction deprived her of an opportunity to receive services and reunify with Russell. However, if a child is

---

[5] Mother suggests that the case file contains relevant information because counsel was appointed for Russell in the family law matter, and the statutory role of minor's counsel is to gather evidence bearing on a child's best interests (Fam. Code, § 3151). However, she does not argue that Russell's counsel actually uncovered any relevant evidence.

already placed in the custody of a parent, the juvenile court "is not concerned with reunification" (*In re Pedro Z.* (2010) 190 Cal.App.4th 12, 20), as the goal of dependency proceedings "is to reunify the child with *a* parent." (*In re Adrianna P.* (2008) 166 Cal.App.4th 44, 59 [italics added].) Instead, the court must determine "whether . . . dependency [jurisdiction] should be terminated or whether further supervision is necessary." (*In re Joel T.* (1999) 70 Cal.App.4th 263, 267.)

"When deciding whether to terminate jurisdiction, the court must determine whether there is a need for continued supervision, not whether the conditions that justified taking jurisdiction in the first place still exist." (*In re Janee W.* (2006) 140 Cal.App.4th 1444, 1451.) In this case, the juvenile court appropriately determined that its supervision was no longer necessary; it was therefore justified in terminating jurisdiction.

## II.     Custody Orders

### A.     *Applicable Law and Standard of Review*

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122; see also §§ 364, subd. (c), 362.4.) After placing a child with a nonoffending parent pursuant to section 361.2, the juvenile court is expressly authorized to issue exit orders providing "that the [nonoffending] parent become legal and physical custodian of the child[,]" and "may also provide reasonable visitation by the noncustodial parent." (§ 361.2, subd. (b)(1).)

We review these exit orders "'for abuse of discretion [citation] and may not disturb the order unless the court ""exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination [citations].""'" (*In re M.R.* (2017) 7 Cal.App.5th 886, 902.)

10

**B.    *Analysis***

Mother argues that the exit order is impermissibly vague for two reasons:  (1) it "improperly delegates to" father the authority to determine "when or if visitation between [mother] and [Russell] will occur[;]" and (2) the exit order "provides no guidance on the basis for the . . . order[], nor of the treatment that [mother] would need to participate in to request a change in order."  For the reasons below, we agree with the latter argument.[6]

1.    *Delegation*

"'The power to determine the right and extent of visitation by a noncustodial parent in a dependency case resides with the court and may not be delegated to nonjudicial officials or private parties.  [Citation.]  This rule of nondelegation applies to exit orders issued when dependency jurisdiction is terminated.  [Citations].'"  (*In re A.C.* (2011) 197 Cal.App.4th 796, 799.)  Although "[a] visitation order may delegate to a third party the responsibility for managing the details of visits, including their time, place and manner[,]" it may not "delegate discretion to determine whether visitation will occur, as opposed to simply the management of the details."  (*In re T.H.*, *supra*, 190 Cal.App.4th at p. 1123.)

Mother contends that by including language that visitation shall be "as arranged by the parents, but no less than . . . 3 hour(s), 2 times per . . . month[,]" the exit order "essentially results in a situation where [father] can decline to arrange visits."  To the contrary, the juvenile court's language establishes a minimum number of visits at a fixed duration; while father can determine the time and place of mother's visits, he must facilitate

---

[6]    In its reply brief, DCFS did not respond to mother's argument regarding the exit order's lack of guidance.

at least two three-hour visits per month.  (Contra, *In re Rebecca S.* (2010) 181 Cal.App.4th 1310, 1314 ["[L]eaving the frequency and duration of visits within the legal guardian's discretion allows the guardian to decide whether visitation actually will occur"].)

Citing *In re T.H.*, *supra*, 190 Cal.App.4th 1119, mother argues that the visitation order is "nearly unenforceable," because, unlike in the prior 2-2-5 custody order, it "is unclear as to what days and times that [mother] will visit with [Russell], [and] this is a situation where the parents will not agree upon an arrangement."  Although mother and father, like the parents in *In re T.H.*, "do not get along" (*In re T.H.*, *supra*, at p. 1123), this case is otherwise distinguishable.  In *In re T.H.*, the juvenile court's exit order provided supervised visitation for the noncustodial parent "only upon the 'agreement of the parents[,]'" "effectively delegat[ing] to [the custodial parent] the power to determine whether visitation w[ould] occur at all." (*Ibid*.)  The juvenile court's abuse of discretion in that case was not in giving the custodial parent the power to schedule visits, but rather "framing its order in a way that gave [the custodial parent] an effective veto power over" the noncustodial parent's visitation rights.  (*Id.* at p. 1124.)

Here, the exit order does not allow father to curtail mother's visitation rights beyond a set minimum; it merely allows him to "manage[] . . . the details" of visits.  (*In re T.H.*, *supra*, 190 Cal.App.4th at p. 1123.)  It is thus a proper delegation of authority.  If father were to act in a way that thwarts mother's visitation rights, she would be free to seek enforcement or modification of the order in the family court.  (Contra, *ibid.* [the noncustodial parent's "ability to . . . modif[y] or enforce[] . . . the order in the family court does not solve the problem of this *unauthorized* delegation"] [italics added].)

12

### 2. *Lack of guidance*

When a juvenile court grants custody to the nonoffending parent and terminates jurisdiction, the court must prepare and file an exit order (Judicial Council Forms, form JV-200) in accordance with rule 5.700 of the California Rules of Court. Among other things, "'[t]he orders need to provide specific direction to the parents and other parties to facilitate compliance and reduce the potential for conflict[.]'" (*In re Anna T.* (2020) 55 Cal.App.5th 870, 878.)

In addition, the final custody orders "'must address the circumstances that led to the juvenile court's child custody and parenting time orders to enable a family court to determine whether circumstances have changed to a degree that justifies considering whether the requested modification is in the best interests of the child. The child custody orders need to serve these functions without disclosing juvenile case information that should remain confidential, because juvenile court child custody orders, including attachments, are not themselves confidential. (§ 362.4.)' [Citation.]" (*In re Anna T.*, *supra*, 55 Cal.App.5th at pp. 878–879.)

As discussed above, the record in this case amply supports the juvenile court's decisions to remove Russell from mother's custody and to restrict her visitation rights. Unfortunately, the exit order memorializing those decisions is deficient. While the juvenile court properly used the JV-200 form and attached forms JV-205 and JV-206, the information provided on the JV-206 form is inadequate. Instead of setting forth the juvenile court's reasons for restricting mother's parental rights, the order merely reiterates that mother is entitled to "only supervised visitation." The juvenile court checked a box indicating that mother "has not completed . . . court-ordered programs[,]" but does not specify

13

which services or programs mother needed to complete.[7] Nowhere does the juvenile court address the circumstances that led to mother losing custody and having limited visitation.

Under these circumstances, the matter must be remanded so that the juvenile court can amend the exit order to include the reasons for its custody and visitation orders. (See, e.g., *In re A.C.*, *supra*, 197 Cal.App.4th at pp. 799–800 [after termination of jurisdiction, juvenile court is empowered to make exit orders regarding visitation].)

## DISPOSITION

The juvenile court's orders are affirmed. The matter is remanded to the juvenile court with directions to set forth, in the JV-206 form, its reasons for removing Russell from mother's custody and limiting her to twice monthly monitored visitation.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, J.
ASHMANN-GERST

We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT

---

[7] We note that the record does not indicate that mother was ever ordered to participate in services.